# T.R. Status Report

## December 30, 2019

Submitted under the

Settlement Agreement

in *T.R. v. Birch and Strange*

Hon. Thomas S. Zilly

U.S. District Court, Seattle

No. C09-1677-TSZ



## __Table of Contents__

Introduction                                                    3

I:   Implementation Highlights                                   4

II:  Preparing for Exit                                         31

III: Glossary of Terms                                          34

IV: Attachments                                                 38

# Wraparound with Intensive Services (WISe) Implementation Status Report

## Introduction

In December 2013, the state of Washington settled *T.R. v. Birch and Strange* (formerly Dreyfus and Porter), filed four years earlier, which required the State to provide children and youth on Medicaid with intensive mental health services in homes and community settings. In the settlement, Washington State committed to developing intensive mental health services, based on a "wraparound" model, so that eligible youth can live and thrive in their homes and communities and avoid or reduce costly and disruptive out-of-home placements. As part of the settlement, Washington State developed Wraparound with Intensive Services (WISe). WISe is designed to provide comprehensive behavioral health services and supports to Medicaid-eligible individuals, up to 21 years of age, with complex behavioral needs and to assist their families on the road to recovery.

By early 2018, parties acknowledged that the State would not have completed all exit criteria by the original anticipated completion date of June 2018. In April 2018, the parties submitted a Stipulation to the Court[1] with clarifications to various exit criteria of the T. R. Settlement Agreement and to further apprise the Court on the status of the implementation efforts.  In June 2019, it was determined the State needed additional time to allow demonstration of exit criteria established in the T.R. Settlement Agreement.  On July 1, 2019, the parties determined an additional 12 months (July 1, 2019 - June 30, 2020)[2] would be necessary to complete all exit criteria and agreed to further clarifications to the exit criteria in para 69 (c) of the Settlement Agreement[3].

Until the exit of the settlement agreement, the State will provide the Court, the plaintiffs, and the public with an annual T. R. Status Report that describes progress in meeting obligations under the agreement. This T. R. Status Report is the sixth annual report.

This year's report highlights statewide efforts since November 2018. Section I provides a summary of accomplishments in 2019 and upcoming changes.  Section II signals that the parties are working toward exit. In early 2020, the parties will work in collaboration to create an outline for a final court report regarding whether the State has met the T.R. Settlement Agreement exit criteria by the expected date of June 30, 2020.   Section III contains a glossary of key terms and Section IV has relevant attachments.

---

[1] Included in section IV. Attachments, pp 39-42.
[2] Included in section IV. Attachments, pp 43-46.
[3] Included in section IV. Attachments, pp 47-52.

## I. Summary of Progress

Over the past year, Health Care Authority worked with all levels of the child serving system on targeted efforts to accomplish obligations identified during T. R. mediation while at the same time maintaining statewide implementation benchmarks.  Partners in this work include the Department of Children, Youth, and Families (DCYF), Department of Social and Health Services/Developmental Disabilities Administration (DSHS/DDA), statewide and regional Family, Youth, System Partner Round Tables (FYSPRTs), WISe agencies, and Managed Care Entities (i.e. Behavioral Health Organizations and Managed Care Organizations).

Areas of focus included:

- Access and Service Delivery
- Due Process
- Quality Management Plan
- WISe/Behavior Rehabilitation Services Integration

This report provides updates on these critical areas and also showcases approaches intended to move WISe implementation past compliance.  Over the past five years, the State has implemented a model of care, informed by youth and families, which attempts to stretch beyond T.R. obligations.


**Washington Has Made Significant Advances over the Past Year**

1. **An increasing number of children and youth are receiving WISe screens in a timely manner**

Implementation data indicates that the number of referrals and screenings continues to grow. In SFY 2019 (July 1, 2018, through June 30, 2019), **5,389 WISe screens** were conducted for an unduplicated total of 4,645 youth, representing a 14% growth in youth screened over the prior fiscal year. The largest referral sources for the WISe program are mental health outpatient, (29%), self and family (25%), and Department of Children, Youth, and Families (19%).

Of the 5,389 screens conducted in SFY 2019, **87% were conducted within 14 days of referral**, the standard for screening timeliness. This is consistent with the level of screening timeliness over the past three years (SFY 2017 - 87%; SFY 2018 - 89%; SFY 2019 - 87%). In the upcoming year, Health Care Authority (HCA) will work with regions whose rates are below 80% on improving screening timeliness.

In total, from July 1, 2014, through June 30, 2019, **16,976 total WISe screens** were conducted.

### 2. More children and youth are receiving WISe services

WISe is available in all of Washington's 39 counties.  Over the past year, six new agencies started providing WISe and existing WISe agencies have expanded their number of teams and increased their areas of coverage. Additional agencies are indicating an interest in developing WISe teams.  Two of the new WISe agencies, one in King County and one Yakima County, are focusing services specifically on birth to five years old.

**WISe Service Providers,** as of November 2019



NOTES: WISe services are provided in all 39 counties (Wahkiakum and Skamania do not have a local, in-county provider, but are served by providers in neighboring counties). Map shows 71 WISe providers operating as of November 2019.

With the expansion of the provider network, the State increased capacity to provide services and supports in home and community settings.  October 2019 enrollment reports from Managed Care Organizations show over 2600 youth receive WISe monthly, which meets the monthly caseload service target in the settlement agreement.  These monthly service target numbers will be further validated as encounter data matures.

A total of **8,344 youth** are estimated to have received WISe services between July 2014 and March 2019.  In the last four quarters of data available (April 2018 - March 2019), a total of 4,656 youth were served in the WISe program, up 23% from the 3,786 served in the prior year (April 2017 - March 2018).

Additionally, WISe service intensity has increased in many regions across the state. The statewide three-month moving average number of service hours per youth per WISe service month was 11.0 in April 2019, not including data from King County. [4] This average varied among regions, ranging from 7.7 hours per service month in North Central to 12.9 hours per service month in Pierce. Across the state in calendar year 2018, service hours occurred in homes (34%), in outpatient settings (33%), at school (8%), and in other community settings (24%). A small number of services were delivered in residential care settings and correctional facilities (2%).

[The remainder of this page is intentionally left blank.]

---

[4] King County service intensity estimates have been suppressed due to service unit reporting errors identified between January and June 2019, which affected earlier estimates for this period. The state is developing a correction to account for these reporting errors, and is examining service data more broadly to determine if similar reporting errors occur in any other regions/time periods. The state is also developing adjustments to service intensity estimation procedures to account for the transition to 2019 SERI reporting standards, available at: https://www.hca.wa.gov/billers-providers-partners/behavioral-health-recovery/service-encounter-reporting-instructions-seri. Although new SERI standards officially went into effect in July 2019, adjustments may affect estimates back to January 2019. An updated Service Intensity Report for King County will be disseminated publically once completed.

**WISe Service Intensity: Three-Month Moving Average**, as of April 2019



*\* See footnote 4 for additional information*

The percentage of services modalities delivered in each region also varied. Statewide, the top five service modalities, by hours of WISe services are: individual treatment services (32%), peer support (17%), child and family team meetings (15%), care coordination services (10%), and family treatment (7%).

The full WISe Service Intensity Report, WISe Characteristic Report and the WISe Quarterly Dashboard reports are all available on the HCA Website under the "Current Reports" section.[5]

### 2. Children and youth are benefitting from WISe services

Youth and families report substantial benefits from participating in WISe. WISe uses quantitative and qualitative feedback from its youth and family survey as well as the Child and Adolescent Needs and Strengths (CANS) tool to measure progress and need for improvement.

CANS is administered at intake and every three months while the child or youth participates in WISe. The tool measures the number of 'need' items that require immediate

---

[5] Link to WISe Reports: https://www.hca.wa.gov/about-hca/behavioral-health-recovery/wraparound-intensive-services-wise-0

attention as well as the number of current strengths that the youth and family have. Both needs and strengths show improvement as WISe services are provided. The percentage of youth with clinically significant treatment needs declined across all five of the top behavioral and emotional domains including emotional control problems, mood disturbance, attention/impulse problems, anxiety, and adjustment to trauma.

Recent CANS data from youth who have received WISe shows improvement in the youths' level of functioning, including changes in needs, risk factors, and strengths. After receiving six months of WISe services, the percent of youth with actionable treatment needs decreased as depicted below:

**Changes in CANS Item Scores between Baseline and Six-Month Follow-Up**
Youth with Initial Assessments January - December 2018



Emotional control problems decreased from 78% to 56%, the percent of youth with mood disturbance problems decreased from 70% to 48%, and the percent of youth with decision-making problems decreased from 59% to 45%. The percent of youth with identified natural supports increased from 63% to 71% after the first six months of receiving WISe.

CANS data is publically available through the Behavioral Health Assessment Solution (BHAS) quarterly trends reports. State level and regional reports are available on the HCA website and are updated quarterly[6].

A new set of outcome measures based on administrative data was produced in June 2019, and will be added to the next Annual WISe Dashboard, to be released in early 2020. The

---

[6] BHAS Quarterly reports: https://www.hca.wa.gov/about-hca/behavioral-health-recovery/wraparound-intensive-services-wise-0#bhas-reports

outcomes show that WISe participants make important progress in a variety of domains following WISe entry, including reduced mental health inpatient utilization, reduced emergency department visits, reduced suicide and self-injury diagnoses, and increased foster care placement stability. A separate analysis produced by the Office of the Superintendent of Public Instruction (OSPI) in collaboration with the Education Research Data Center (ERDC) and DSHS Research and Data Analysis Division (RDA) also shows that WISe participants display a reduction in school absences and suspensions or expulsions after engaging with the WISe program.

## WISe Educational Outcomes
SFY 2018 Entry Cohort

**ABSENCES:** Of WISe clients linked with educational data and enrolled in the quarter, the proportion of school days absent of total school days enrolled.

**SUSPENSIONS/EXPULSIONS:** Of WISe clients linked with educational data and enrolled in the quarter, proportion with any suspensions or expulsions in each quarter.





**NOTES:** Statistics reflect the experience of youth entering the WISe program in SFY 2018. Analyses performed by ERDC and OSPI on behalf of DSHS Research and Data Analysis Division.

The full WISe Education Outcomes report is available online at:
https://www.hca.wa.gov/assets/program/wise-education-outcomes-2019.pdf


## Celebrating Successes!

WISe agencies across the state celebrate success as much as possible, including at the start of each Child and Family Team meeting, and when youths achieve their goals and transition to a less intensive level of care.  Below are a few success stories shared by youth and families enrolled in WISe and WISe providers:

- Two siblings in foster care were enrolled in behavioral health services, one in traditional outpatient services and one in WISe.  After a brief period of time, the

foster parents recognized the intensive level of services provided through WISe and stated, "We really should have opened in WISe for him instead!" referring to the sibling enrolled in traditional outpatient services. To better support this child's needs, WISe gathered a full team together.  In addition to the WISe staff, team members included his social worker, foster parents and their relatives, school staff, daycare provider, and others.  Shortly after WISe was initiated, he exhibited tantrums which included throwing things, scratching, and biting. Complicating his behavior more was a history of sleeping problems and sensory issues. For months, this child continued to have big challenges and the foster family reported feeling tired and hopeless. He also continued to have significant challenges at daycare and school, which ultimately led to the daycare center requesting a transfer to another caregiver.  During the transition, the WISe team was instrumental in supporting him as he entered a new foster home and a new school.  The new foster family participated in the WISe process and helped him feel supported and optimistic. Over a period of time, the whole WISe team witnessed him thrive. During the process, the caregivers increased their understanding and learned new strategies for meeting the child's needs.  Eventually, he was able to re-enroll in his previous daycare. At discharge from WISe, he was doing well in school, tantrums reduced and he had developed a special bond with his new foster family. At last update, there was discussion of the foster family becoming a part of his permanency plan.

- A transition age youth participated in WISe for about a month before needing to transition to inpatient substance use disorder treatment. When she returned home, she was immediately reengaged in WISe with an approach specifically designed to support transition age youth.  While enrolled in WISe, she maintained recovery, eliminated using the substances that required inpatient treatment, improved relationships with her caregivers, passed her first classes since grade school, and became involved in community activities.

- A foster family welcomed into their home three siblings who had experienced tremendous trauma.  One of the boy's behaviors was so extreme he engaged in aggressive outbursts almost 24 hours a day, every day.  Before WISe, the family reported a loss of hope and a sense of uncertainty as to whether the siblings would be able to stay together.  The family voiced a strong commitment and dedication to each other.  The WISe team supported the family's shared vision, provided intensive services in the home, coordinated with school staff, and engaged additional supports which included a behavioral specialist. Over time the family grew together in leaps and bounds.  Currently, all three of the siblings are succeeding in school, sports, and all aspects of life.  As a family unit, they have demonstrated on-going support, increased communication, and a shared love for the family vision where all the boys remain in the same home. In December 2019, all three siblings will be officially adopted and will stay together.  The WISe team is invited to the adoption ceremony and are excited to be part of this family's next steps.

**3. The Family Youth System Partner Round Tables (FYSPRTs) play a crucial role in supporting the delivery of WISe services**

Family Youth System Partner Round Tables (FYSPRTs), part of the Children's Behavioral Health Governance Structure, provide youth and families opportunities to play an active role in how systems serve them.  FYSPRTs[7] are a platform for families, youth, and system partners to collaboratively voice ideas and feedback to inform decision making at the regional and state level. FYSPRTs are based on System of Care core values: family driven and youth guided, community based and culturally and linguistically competent. FYSPRTs at the state and regional level are facilitated and led by a family, youth, and system partner tri-lead team. The intention in the design of the governance structure is to use community strengths to address challenges and barriers as close to the community as possible.

The Statewide Family, Youth, System Partner Round Table (FYSPRT) consists of family, youth, and system partner Tri-leads from the regions and state-level, child-serving system partners. Since 2013, the number of Regional FYSPRTs has increased from four to ten.

These ten regional FYSPRTs communicate and work with the statewide FYSPRT to resolve regional challenges using the Challenge and Solution Submission Form after attempting to address and resolve the issue within the region. The regional FYSPRTs also have been working to identify community and FYSPRT needs and then develop a five-year strategic plan and an annual work plan to address those needs.

Some examples of how the FYSPRTs have been impactful and will continue to be impactful as we approach full integration in January 2020 include a System of Care Hub in Mason and Thurston Counties. The goal for these counties was to create on online hub for youth, families, schools, agencies, and organizations to be able to locate and explore programs and services in the region. Partners in this hub include behavioral health, child welfare, state juvenile rehabilitation, developmental disabilities, education, family and youth organizations/programs, probation, and tribal partners. Coordinated Care of Washington (CCW), a managed care organization, has engaged in the regional FYSPRTs with CCW representatives being selected to be the System Partner Tri-lead for the Salish and North Sound FYSPRT, by providing a Wellness Recovery Action Plan training for the Greater Columbia FYSPRT, and working on fundraising for regional FYSPRTs during Mental Health Awareness Month. In another example of FYSPRT impact, the Statewide FYSPRT receives consistent feedback in evaluations that attendees appreciate the time to talk to and connect with family, youth, and system partners from other regions across Washington as well as state child serving system partner representatives. Having the Statewide FYSPRT as a platform to connect unites us all around the joys of the work and to support each other around the challenges of the work. FYSPRTs are a real life example of system of care values in action both at the regional and state levels.

---

[7] More information available at: https://www.hca.wa.gov/about-hca/behavioral-health-recovery/family-youth-system-partner-round-table-fysprt

*A success story that links with FYSPRTs*: TJ[8] never imagined living past the age of 19. Growing up, he didn't feel safe at home. His father lived on the wrong side of the law and never made time for him. His mom worked two jobs to keep their family afloat, and he didn't have the emotional support of his family that every child needs. Much of his youth was spent alone. He shared that he mostly existed in a comatose state and often contemplated suicide. His family's trailer felt more like hell than a home. He started using drugs and alcohol in middle school. But he wanted more from life.

He began to feel hopeful his freshman year of high school, when his teacher steered him toward the WISe program. The WISe staff listened and empowered him to find his voice and create the change that he wanted and needed. They brought together a team to support him that included his mom. Together, the team discovered TJ's strengths and created a plan to overcome the challenges and help him reach his goals. His mental health needs were addressed through therapy. He began to open up about his trauma and started to discover who he was and who he wanted to be.

As TJ's life improved, he decided to pursue his interests in youth advocacy. He got involved with student government at his high school, as well as the regional Family and Youth System Partner Round Table (FYSPRT). He has served in leadership roles and he continues to advocate for youth with mental health challenges throughout Washington State. He graduated from both the WISe program and high school, and now has the opportunity to attend college. TJ says that WISe helped him find hope and realize that mental health challenges don't have to stand in the way of meeting his goals.

4.  **Washington child serving systems are working to improve access to and coordination with WISe.**

Over the past year, HCA continued collaboration with the Department of Children, Youth and Families (DCYF) and DSHS/Developmental Disabilities Administration (DDA) to improve access to WISe.  The information below highlights these efforts.

**Behavior Rehabilitation Services (BRS) and WISe** will be delivered together in a highly coordinated effort**.**  BRS is a temporary intensive support and treatment program for foster children and youth with high-level complex service needs who are in the care and authority of Washington State Department of Children, Youth and Families (DCYF). DCYF contracts with BRS providers to deliver supports that are intended to stabilize foster children and youth and assist them in transitioning to less intensive or restrictive services and achieving their permanent plan.

The intent of BRS aligns with the WISe program. Both BRS and WISe services share the following objectives when safely possible:

---

[8] Not the youth's real name or initials

- Support children and youth and their families to receive services in the least restrictive environment in a way that will safely meet their needs both for placement and treatment.
- When possible, meet the needs of children and youth in community-based settings to prevent the need for placement into a more restrictive setting.

At the start of WISe implementation in July 2014, there was a policy decision not to offer WISe to youth in BRS placements.  However, as a part of ongoing program development and as an outcome of discussions between the parties, DCYF and DBHR agreed in March 2018 to begin providing BRS and WISe concurrently.  To prepare for this statewide initiative, DCYF and DBHR completed a work plan in May 2018.  The plan included launching four "early adopters" BRS/WISe sites. The input from these sites informed statewide planning through early "lessons learned." Staff from the four sites also participated in regional technical assistance sessions to prepare BRS and WISe providers for the statewide launch in October 2019.

Phases of implementation include:

- July 2019: On a voluntary basis, agencies with contracts for both BRS and WISe were invited to begin providing services concurrently.
- August 2019: DCYF Dependent class members who were already enrolled in WISe services and who were placed in BRS were permitted to remain in WISe services.
- October 2019: All class members who screened eligible for WISe and were being placed in BRS were offered WISe.
- October 2019: Class members who screened eligible for WISe and were already receiving BRS were eligible to receive WISe upon availability and until then offered CFTs every other month until WISe is provided.
- January 2020: Class members who are receiving BRS and screen eligible for WISe at the time of their six-month WISe screening may receive both services concurrently.

HCA and DCYF staff provided training and technical assistance (TA) over the course of a year. Between November 2018 and April 2019, BRS staff received training on the BRS/WISe initiative and more in-depth information about WISe, including information on the CANS screening and assessment, the role of the Certified Peer Counselor, Child and Family Team meetings, and the overarching Washington State Children's Behavioral Health Principles. In August and September 2019, regional TA sessions were provided to BRS and WISe providers. Other training opportunities included: BRS presentation session for WISe providers at the 2019 WISe Symposium and a BRS/WISe Panel presentation from the four implementation sites at the 2019 WISe Symposium.  Additionally in October 2019, HCA and DCYF completed a Guidance Document[9] that will be updated as needed.

During the first year of implementation, HCA and DCYF will focus on system implementation and identifying any system barriers and/or any additional training or TA

---

[9] https://www.hca.wa.gov/assets/program/wise_guidance_document_october.pdf

needed to support the new initiative.  As the program grows and data matures, outcomes from the BRS and WISe initiative will be available through CANS data and reported out and posted on the HCA WISe website.  Based on experience, the State anticipates an overall benefit to youth receiving BRS and WISe concurrently.

*WISe and BRS success story*: One early success story from providing BRS and WISe concurrently involves a youth who was in foster care from age five to sixteen years old.  After being removed from his mother's care at a young age, he maintained some contact with her throughout his childhood. Over the years he lived with other family members, in a number of foster homes, and had multiple BRS placements.

During his last BRS placement, he identified an interest in working on ways to better express his needs. He also shared that his most important wish was for a better connection with his mother. This youth was one of the first enrolled in the pilot for providing WISe and BRS concurrently, which launched in October 2018. (To this day, he tells everyone that the BRS and WISe approach was his own idea!)

The WISe Child and Family Team included his mother, and over the course a few months, he transitioned back to her care. He has lived at home for over a year and is still engaged in WISe. Though there have been ups and downs, he reports his relationship with his family is strong. Recently he shared that he will soon be eighteen years old and that he wants to move out on his own, but not right away.  He wants to remain at home just a little longer and his family is excited about this.

**DCYF/Juvenile Rehabilitation (JR)** had multiple meetings with plaintiff's counsel for their input in developing a protocol for the Medicaid enrollment and WISe suitability and referral process. JR defines "WISe suitable" to mean youth with mental health needs who may screen as eligible when a CANS is administered. "Suitability" is defined broadly, based on information gathered in the agency's screens, mental health and substance use, and criminogenic risk/protective factor assessments. It is broadly defined so the WISe option and CANS referral is offered to the maximum number of youth to allow WISe provider engagement, CANS administration, and youth/family interest to be the primary determining factors in WISe participation.

JR invested substantial programmer resources to develop "Medicaid Enrollment and Tracking" and "WISe Eligibility & Referral" modules in its Automated Client Tracking (ACT) system.  They internally developed and released the following modules in the agency's Automated Client Tracking (ACT) system:

- Assessment and Acuity to identify and track mental health acuity, functioning, and diagnoses. This supports identification of potential needs-related eligibility for WISe services.
- Medicaid Enrollment & Status to identify youth's current Medicaid status. This supports coverage-related eligibility for WISe services.

- <u>WISe Suitability & Referral</u> to identify and track WISe suitable youth, based on needs, coverage, and youth/family interest, to generate WISe referrals and track referral outcomes.

In addition, JR enhanced its training efforts to increase JR employee understanding and familiarity with WISe.  JR embedded WISe orientation in the JR Final Onboarding Training and Assessment (FOTA) provided to all permanent hires within the first six months of JR employment.  JR also discussed WISe implementation and improvement strategies at quarterly Behavioral Health Quality Improvement meetings, which included clinicians, psychiatrists, nurses, behavioral health administrator and coordinators, and clinical directors.  Finally, an increased number of JR field staff attended the WISe Symposium in July 2019 in order to deepen staff's understanding of WISe and also to increase community partnerships and relationships.

In 2020, JR will continue to collaborate with MCOs, HCA and SeaMar to identify resources and communication/education strategies that increase youth and family abilities to navigate the integrated medical/behavioral health system.

**JR System Innovation**: JR applied for and received a System of Care grant from the Office of Homeless Youth to hire a WISe Engagement Specialist in the fall of 2019.  Interviews were held for this position in early December 2019 and JR anticipates having staff hired in January 2020. The goal of the position is to increase youth participation in the voluntary WISe program, particularly youth of color, who represent 64% of JR youth.  Ideally, the selected candidate will be a person with lived experience in the juvenile justice system or other systems of care.

Prior to applying for the grant, JR received signed letters of support for the grant from MCO executives.  The letters expressed support for creative approaches to WISe eligibility screening and enrollment, including accepting CANS completed by certified JR personnel. The two-year project position will work with JR team members, partners at the Health Care Authority, Managed Care Organizations and WISe providers in the community to increase access to WISe services for youth who release from JR facilities. They will model and advocate for trauma-informed, culturally responsive approaches to engaging youth in supports and services, and serve as a bridge between JR residential programs and providers in the community.

The person in this position will have a unique opportunity to balance direct connection with youth and their families and systemic influence with leaders and providers around the state. The position will connect with youth residing in JR institutions to educate them about the WISe option, screen youth and families for eligibility, and facilitate preparation and participation with those who are eligible and interested.  They will also collaborate with internal and external leaders, and providers in the community to develop and strengthen relationships and processes that increase capacity to offer meaningful support to youth and families who would benefit from WISe.

*WISe success story:* A twelve-year-old male entered WISe with a variety of struggles, including difficulties with his mother and sibling, school behavioral concerns, and juvenile justice involvement.  At school, he displayed no evidence of learning, cursed at staff members, slept a good part of the day, and missed the bus regularly.  In the classroom, he escalated to the point where other students needed to be removed to keep everybody safe. He was arrested after an incident resulted in damage to his classroom, breaking the fire extinguisher in the school hallway, and allegedly assaulting a teacher. At home, he refused to take his medication on a regular basis, if at all, cursed at mom, destroyed furniture and carpeting, intentionally instigated fights with his older sibling, and lacked respect for rules and expectations at home and in the community.  Initially, the WISe team focused on stabilizing the family unit, including positive communication strategies and assisting mom in setting and maintaining boundaries with her son. Over the course of treatment, with support, mom implemented a one-to-one system, where he would earn video game time for taking his medicine and internet time for making the bus and making a good faith attempt to do school work.   The WISe team supported his mom in regaining authority in her home through positive discipline techniques. His IEP was modified to include executive functioning challenges and new strategies were implemented in the classroom, ultimately leading to a successful school experience and earning additional privileges outside of his behavioral classroom. The youth himself made significant gains in social skills, particularly taking accountability for his actions, whether they were negative or positive and learning about how to act based on his environment. Two months into the next school year, the youth was displaying evidence of learning in the classroom, was engaged in extracurricular sports, attending a general education class, and receiving praise from teachers and other school staff. One staff member commented, "On a scale of 0-10, he's a 58! This was a kid who used to curse at me and now comes up and says, 'Hi Coach!'" In the home, mom reported he was "keeping his room relatively clean" and was working towards repaying restitution through completing additional chores.  After a year of services, the youth and his family graduated from WISe after meeting all of their treatment goals.


**DSHS/Developmental Disabilities Administration (DDA)** has continued to actively support activities related to the T.R. Settlement agreement throughout 2019.

DDA offers positive behavior support (PBS) as a service option for individuals enrolled in the five Medicaid home and community based service waivers administered by DDA including: Basic Plus, Children's Intensive In-Home Behavioral Support (CIIBS), Individual and Family Services (IFS), Core, and Community Protection waivers.

Applied Behavioral Analysis (ABA) and WISe are two such benefits that are available in the state plan. PBS is currently available in waivers administered by DDA to supplement services available in the state plan to meet the behavioral health needs of young people with developmental disabilities. DDA has continued to work in partnership with the Health Care Authority (HCA) to coordinate efforts in supporting DDA clients using ABA and/or WISe.

Tasks completed since the previous T.R. Implementation Status Report include:

- In June 2019, DDA Management Bulletin D17-021 was amended and is now referenced as D18-015. The Management Bulletin was updated to replace outdated attachments with current hyperlinks.
- In April 2019, DDA Policy 4.06, *Children's Intensive In-Home Behavioral Supports,* was updated to include information on how the DDA Case Manager can best work with the WISe Facilitator for Child and Family Team meetings.
- Throughout the year, DDA facilitated bimonthly behavior support staffings. The cases reviewed include individuals who are running into barriers accessing services or have such complex needs that Central Office involvement is required. Representatives from the HCA are included in these meetings, including those who work exclusively with WISe.

At the time of the last implementation status report, DDA committed to monitoring the number of WISe Screens by Referral Source as documented in the Behavioral Health Assessment Solution (BHAS). While there hasn't been a substantial increase in the number of referrals coming directly from DDA, there has been a steady increase in the percentage of people who identify as being involved with developmental disability services at WISe entry according to BHAS data (2015 - 5%, 2016 - 6%, 2017 - 7%, 2018 - 7%, and 2019 - 9%).[10]

Over the next year, DDA will continue to work as a cross-system partner to develop a best-practices protocol. Additionally, DDA will continue to provide training opportunities to the field regarding the availability and benefits of WISe services.

Trends in WISe screening and services for youth involved with the Developmental Disabilities Administration will continue to be monitored in the Annual WISe Dashboard and the Quarterly WISe Screening report. Additionally, a new item will be added to the Annual WISe Dashboard for trends in WISe screening and services for Medicaid youth diagnosed with Autism Spectrum Disorder.

5. **Washington has developed a strong structure to guide quality management, improvement, and accountability**

In May 2019, DBHR published the updated WISe Quality Plan,[11] which provides a quality framework for the WISe program. This Quality Plan provides tools, strategies, and resources to help ensure that WISe efficiently delivers high quality, effective care to Washington's children and youth with complex behavioral health needs and their families.

---

[10] *Based on information gathered from the WISe Quality Management Plan – Quarterly Report for Quarter 2, and 2019 Statewide WA Behavioral Health System generated on August 5, 2019.*

[11] The WISe Quality Plan is available online at https://www.hca.wa.gov/assets/program/wise-quality-plan.pdf

Its components facilitate both performance benchmarking and adaptation to better meet the needs of children, youth, and their families.

The release of the updated Quality Plan was the culmination of a lengthy revision process involving substantial reorganization of content, addition of considerable detail to better describe processes for quality improvement, and many hours of discussion and consultation with Plaintiffs' Counsel and other stakeholders. The 2019 version replaces the previous WISe Quality Management Plan (or "QMP"), which was finalized in 2014 and last amended in 2015. Content revised and expanded in the updated Quality Plan includes:

- An expanded section on the Quality Improvement Infrastructure, including description of the structure, responsibilities, and expectations for each of the component groups.
- Specific measures that used administrative data to report on outcome measures for participants in the WISe program, to be reported on an annual basis.
- Information about the WISe Quality Improvement Review Tool, a case file review process that measures core practice components and provides feedback about how those practices align with the WISe Manual.
- Guidance on performance measures with established benchmarks as well as desired trends for performance monitoring and improvement of other key measures.
- A model for problem-solving and identifying quality improvement strategies.
- An updated, comprehensive list of WISe quality indicators, as well as sources for each indicator, review expectations, and guidance where available.[12]

To facilitate dissemination and use of the updated Quality Plan, DBHR held multiple technical assistance sessions with representatives from the WISe Behavioral Health Provider Agencies, the regional Behavioral Health Organizations (BHOs), and the statewide Managed Care Organizations (MCOs). In addition, HCA is currently engaging in a public rulemaking process to ensure that the structures, data, and processes described in the Quality Plan are maintained and sustained.

### 6. Washington focuses on Youth and Family Peer Development

HCA has a commitment to creating leadership and workforce opportunities for Youth and Family Peers across the state. The most effective way to activate this work is to listen to youth and family peers in the workforce to understand their needs and interests and work to identify and support career advancement opportunities.

To lead this work, HCA/Division of Behavioral Health and Recovery (DBHR) employs both a Youth Liaison and a Family Liaison to convene and facilitate Youth and Family Peer Development efforts and to provide support to WISe youth and family peers across the state.

---

[12] See appendix B of the WISe Quality Plan

The DBHR youth liaison position requires lived experience through past involvement with a child-serving system and also experience working within WISe. The youth liaison provides technical assistance to WISe agencies, presents at statewide and national conferences on the youth peer role and acts as the point of contact for juvenile justice issues related to WISe access.

The DBHR family liaison position requires lived experience as a parent/caregiver raising a child or youth experiencing behavioral health needs. This position supports creating leadership and workforce opportunities for family peers across the state. Family peers play a critical role in WISe teams. They assist parents/caregivers in navigating a complex system and provide understanding, support, and advocacy using their own lived experience as a parent/caregiver.

The family liaison has been a long-standing role within DBHR that precedes implementation of WISe and historically goes back to the late 1990s.   The family liaison provides technical assistance to WISe agencies, presents at statewide and national conferences on the family peer role with a particular focus on family driven care and also is the program manager for the Washington State Children's Behavioral Health Statewide Family Network (the Network) contract.  In September of 2019, with the support of Jane Walker, National Consultant and Executive Director, The Family Run Executive Director Leadership Association (FREDLA); Ellen Kagen, National Consultant and Director (retired), Georgetown Leadership Program; and Dan Embree, National Consultant and Director, En Route Coaching & Training Services, LLC; Washington State Community Connectors, who holds the contract for the Network; hosted a "Leveling Up For Families in Children's Behavioral Health" event to acknowledge the last five years of work completed and create a collaborative vision for the future around the network's  structure and initiatives.  The existence of this network is vital to workforce development for WISe and other family peer positions in Washington State. Some of the Network's work has include events such as an annual parent training weekend and Children's Behavioral Health Summit.

Some of the leadership opportunities developed over the past three years for youth and family peers, include the following:

- WISe Symposium 2017, 2018, and 2019 planning committees
- WISe Symposium 2017, 2018, and 2019 keynote speakers
- WISe Symposium 2017, 2018, and 2019 presentations
- Family, Youth, System Partner Round Tables
- Lead trainers for Washington State Certified Peer Counselor youth and family curriculum
- Technical assistance to FYSPRTS on engagement and leadership
- Lead trainers for Washington State Certified Peer Counselor youth and family curriculum
- Lead trainers for Washington State Certified Peer Counselor Standard Training

- Tri-Led Statewide WISe training for all WISe staff
- Evaluators of current community WISe trainings in Washington
- Development of family and youth leadership trainings in collaboration with Ellen Kagen, currently underway.

In January 2020, Ellen Kagen, National Consultant and Director (retired), Georgetown Leadership Program, with support from Washington State Community Connectors, contractor for the Network, is scheduled to provide a two-day experience for family leaders to support and build leadership skills and approaches in system of care.

In early 2020, with guidance and leadership from the youth liaison, HCA/DBHR will finalize and disseminate a Youth Peer Toolkit to provide additional information and resources for youth peers, particularly youth peers who work on WISe Teams.  Information and a link to the Youth Peer Toolkit will be included in the next WISe Manual update.

In April 2020, Ellen Kagen from Georgetown University, with support from the WISe Workforce Collaborative is scheduled to provide a two-day leadership academy for WISe youth peers and youth who have been system involved. This leadership academy and coaching will support participants to become paid trainers for the Youth Professional Leadership curriculum.

Additional demonstration of leadership and workforce development opportunities for youth peers include:

- Participation on the Washington State Partnership Council on Juvenile Justice Committee.
- Participation on a steering committee to determine needs for a youth network in Washington and identify next steps.
- Youth Professional Leadership and Youth Leadership trainings in 2018 that in 2019 expanded to include planning, development. and implementation of a Train the Trainer model.
- Coaching to youth peers statewide.
- The WISe Workforce Collaborative hiring youth peer trainers for WISe and the state required Certified Peer Counseling training. These new youth trainers, worked in WISe, and some are moving to statewide training full time.
- A Youth Peer Workforce Development model was piloted in Washington last year and currently is in the planning stage for year 2 implementation; it is a model that can be replicated in another communities and states.  This work is led by The New Horizons Alternative High School, Students Providing and Receiving Knowledge (SPARK) program in Pasco, Washington. They partnered with HCA/DBHR WISe, Comprehensive Health Care and En Route to pilot a workforce training model that supports high school students becoming state certified peer counselors and apprenticeship opportunities at the completion of the program.

Some of the unique family peer leadership opportunities developed over the past three years include the following:

- Internship position to serve on the CLIP Parent Steering Committee.
- Washington State Children's Behavioral Health Statewide Family Network.
- Planning and presenting at the annual parent training weekend hosted by the Washington State Community Connectors, the contractor for the Statewide Family Network.
- Planning and implementing the Washington Children's Behavioral Health Summit held annually in May to align with National Children's Mental Health Awareness Day.

7. **Washington invests in dynamic training and coaching for WISe practitioners and system partners**

Between July 2014 and September 2019, **over 4,000 participants have attended WISe trainings and technical or coaching sessions** provided by either the Workforce Collaborative, the Praed Foundation, the Evidence Based Practice Institute (EBPI) at the University of Washington, or DBHR staff.

*WISe Workforce Collaborative*: DBHR began with their new vendor, En Route Coaching and Training Services, LLC in July 2018. This vendor offers enhanced training and coaching for WISe practitioners across the state under the contract for the WISe Workforce Collaborative. This collaborative continues to provide the structure required to support workforce development for WISe.

Since July 2018, the WISe Workforce Collaborative was contracted to provide training, coaching, and technical assistance for WISe across Washington State. *Table 1* below provides an overview of the number of WISe staff trained from July 2018 - September 2019.

**Table 1. Workforce Collaborative WISe trainings, July 2018 – September 2019**

| Training Type | Number of trainings | Number of staff trained |
|---|---|---|
| WISe Intro 2-Day | 18 | 346 |
| CANS/WISe 2-Day | 10 | 173 |
| WISe Intermediate 2-Day | 20 | 361 |
| WISe Supervisor 1-Day | 11 | 132 |
| Statewide YF CPC 5-Day | 2 | 61 |
| Regional YF CPC 5-Day | 6 | 122 |
| BRS/WISe Trainings ½ Day | 8 | 144 |
| BRS/WISe TA Sessions ½ Day | 6 | 147 |

Between July 2018 and September 2019, a total of **1,486 participants attended WISe trainings** across the state. Those trained included care coordinators, therapists, family partners, youth partners, or "other" (supervisors, program managers, etc.).

Eight WISe Youth and Family Certified Peer Counselor trainings were provided since the last court report. A total of **183 people** participated in the Youth and Family Certified Peer Counselor trainings between July 2018 and September 2019.

Since July 2018, all 10 regions have had on-site and virtual (calls/web-based) WISe supervisor and practitioner coaching sessions facilitated by the WISe Workforce Collaborative. These sessions focused on quality and fidelity indicators, practitioner skills, supervision/coaching skills, and planning and prioritization of training/coaching topics for WISe supervisors and practitioners. **56 days** of in-person coaching including **15 days** specifically for WISe Mental Health Therapists/Clinicians and **142 hours** of virtual coaching sessions were provided.

*Additional WISe training:* In addition to trainings provided by the Workforce Collaborative, DBHR supports additional trainings opportunities for WISe.

DBHR funds the Evidence Based Practice Institute (EBPI) at the University of Washington to provide training and consultation to increase the use of evidence and research based practice in child and adolescent mental health. EBPI continues an increased focus on the use of Evidence and Research Based Practices (ERBPs) as part of the service array offered by WISe. EBPI's reporting guide provides directions on tracking the use of ERBPs among youth mental health providers including WISe settings. EBPI also received funding to provide trainings to WISe providers on cultural competence and appropriately treating young people with autism in a WISe setting. Those trainings took place in September through December 2018.  Additional training on cultural humility/competence was provided by Dr. Fong Lau-Johnson from the University of Washington at the WISe Symposium in July 2019.

*WISe Symposium***:** In July of 2019, DBHR sponsored the 3rd Annual WISe Symposium in Kennewick, Washington with **445 participants** in attendance.

The theme chosen for this year's symposium **Building up Roles, Bridging the Gaps and Breaking down Barriers** was a continuation of the 2018 symposium theme. This year's external symposium planning committee believed strongly that this is the work that continues across the state to complete implementation and should be the focus of the 2019 symposium.

This year, attendees participated in affinity groups based on their role in WISe, attended keynote presentations on defining success and cultural humility, and listened to WISe youth share their life successes and challenges during the youth panel presentation. Attendees also were able to choose from a list of engaging and informative topics during five breakout sessions. A large number of participants in both the system partner meeting

and symposium reported that they benefited from attendance and look forward to these continuing to be an annual event.

A participant evaluation conducted electronically after the symposium asked participants to rate the conference and keynote sessions using a 5-point scale, with higher ratings denoting more positive experiences. 202 evaluations were completed, for a response rate of 45%. The majority of participants (75%) gave high ratings for all of the keynote sessions, and agreed that the content was relevant and useful, that the symposium was a motivational experience, that they made new connections in the WISe field, and they gained knowledge and skills related to their work.

Evaluation participants were asked which session they attended that will help most in the future; the top six in order of selection were: Using Trauma Informed Principles in Schools, Structural Racism as a Function of Behavior, Gang Awareness 101: Becoming a Change Agent, Understanding Special Education, Improving Systems of Care for LGBTQ+ Youth, and Bridges Out of Poverty.

Additionally, DBHR hosted a third annual system partner meeting to continue the work to promote collaboration between local and state agencies that provide referrals and benefit from WISe; **115 people** attended this half-day meeting.

*Specialized Trainings for WISe Practitioners and System Partners*: Between the fall of 2018 and spring of 2019, the following trainings were provided for WISe practitioners and system partners 1) Cultural Competency, 2) working with youth on the Autism spectrum, and 3) outreach and service provision of WISe and the connection to Foundational Community Services (FCS) to connect youth to education and job training as well as housing supports.

### 8.  Washington continues its efforts to ensure due process protections

During 2019, BHOs and MCOs submitted necessary information for the required quarterly reports to DBHR/HCA reflecting data around the issuance of Notice of Adverse Benefit Determinations (NOABD).  The NOABDs are sent to clients when a requested service has been denied, terminated or reduced, or not been provided timely. This report also reflects any grievance and denials that have been filed by clients during the quarter and the status of the grievance and appeal.

Additionally, the grievance and denial quarterly reports received from the BHOs are used to create a quarterly *Due Process Roll-up Report: Children and WISe*. This information is broken down by region and by the reason for grievances and the type of denials that were issued (such as not meeting CANS algorithm, termination, reduction or suspension of service).

Over this past year, DBHR/HCA continued to offer technical assistance to staff with BHOs and MCOs involved with WISe and WISe provider agency staff. Policies and procedures are

continually discussed to ensure compliance with contract, state, and federal regulations, and the WAC.

The newest version of the WISe Manual, Version 1.9, Section 5 on Client Rights was updated to reflect new policies and procedures for clients' due process including the right to NOABDs. Additionally, to ensure all stakeholders have access to information on a clients' right to due process, a new Grievance, Appeals and Fair Hearing Information sheet was written and vetted and is now available on the HCA WISe web page and through distribution by email and Gov Delivery.

DBHR/HCA continues to following grievance and appeals monitoring process for WISe by:

- Requiring quarterly quality reports from the MCEs that includes data regarding Notices (NOABDs) and Appeals.
- Identifying policies or practices by the MCEs or providers that violate the state and federal due process requirements.
- If informal efforts at remediation fail, taking corrective action measures (including requiring a corrective action plan by the MCE) to address and remediate non-compliance by the BHO/MCO with notice and appeals requirements in the Settlement Agreement and state and federal law.
- Providing BHOs and MCOs technical assistance on due process requirements outlined in the DBHR contract, guidance documents, and the updated WISe Manual for WISe-enrolled and WISe-referred BHO beneficiaries.
- Monitoring BHO and MCO reports on grievances, appeals, and administrative hearings and to correct instances of non-compliance.

DBHR/HCA continues to recognize the need for ongoing technical assistance and quality improvement in the grievance and appeal system and will continue to provide this.  One area that may require monitoring is the obligation under the Settlement Agreement that a child or family may file an appeal when the child or family disagree with the treatment plan. No appeals have been filed since WISe implementation, which raises questions about whether NOABDs are being provided in every case. Monitoring compliance through the use of spot checks on these notices may need to be conducted.

To that end, HCA has also committed to a one-time report which includes following up directly with youth and families to confirm if they received an NOABD. This review will be conducted over the course of two months and will be completed in early 2020.

### 9.  Washington has made a continued financial commitment

Washington continues to commit funding for implementation efforts. Appropriated amounts support direct services, Family Youth System Partner Round Tables (FYSPRTs), trainings and technical assistance, a statewide youth and family survey, and the Behavioral Health Assessment Solution (the database for WISe). The appropriated state budget for

State Fiscal Year 2019 is 99.4 million dollars.  In addition, DBHR uses Federal Mental Health Block Grant and System of Care funding for the annual WISe Symposium for practitioners, youth, families and system partners, FYSPRTs activities as well as promoting youth and family engagement strategies.

In state fiscal year 2015, the first year of WISe implementation, the budget was 15 million, and each following year the legislature has approved an increased budget. The current budget for the T.R. Settlement Agreement is 99.4 million dollars.

Appropriated funding for Fiscal Year 2020 is identified in *Table 2* (below).

| Table 2. WISe Budget, State Fiscal Year 2020 | |
| --- | --- |
| State | $49,745,000 |
| Federal | $49,745,000 |
| **Total WISe Budget** *(includes salaries & encounters)* | **$99,490,000** |

**Washington Has More Work in the Coming Year**

1. **Washington is expanding the integration delivery of care model statewide**

Washington State is committed to whole-person care, integrating physical health, mental health, and substance use services for quality results and healthier residents. Currently HCA contracts with BHOs and five MCOs to deliver care to Medicaid enrollees.  By January 1, 2020, BHOs will no longer be designated to provide WISe and other mental health services. The integrated managed care will be the model statewide with each MCO responsible for covering physical health services, as well as WISe and other mental health and substance use disorder treatment benefits under either the Apple Health Integrated Managed Care (AH-IMC), or Apple Health – Integrated Foster Child (IAHFC) Managed Care contracts. All foster youth through age 18 are enrolled in IAHFC.  Enrollment for youth age 19-25 is available and voluntary. Most Medicaid beneficiaries will be required to enroll in an integrated MCO plan, although there are some discrete populations who will have the option to receive WISe and other care through fee-for-service.[13]

The map below shows which regions are and will be converted from having BHOs administer WISe to MCOs paying for and delivering WISe under the new AH-IMC program.[14]

---

[13]  WISe is available through Fee-For-Service (FFS) by approved WISe agencies for American Indian and Alaska Native youth and their families.

[14] Additional information available at https://www.hca.wa.gov/assets/free-or-low-cost/19-0025.pdf.

## Integrated Managed Care regions



To assist with the final transition into the AH-IMC model, HCA is again holding in-person meetings and webinars, called Knowledge Transfers, which include presentation time from each of the three BHOs to focus on regional differences. MCOs have been working closely with the HCA/Medicaid Program Operations and Integrity (MPOI) and DBHR/WISe since January 2019 and are leading WISe improvements in other AH-IMC regions of the state.  In the remaining regions, MCOs have been working on establishing relationships and attending existing WISe provider meetings to assist with the January 2020 transition.

In preparation for the final AH-IMC shift, Readiness Reviews were conducted with all five MCOs. These compliance reviews are performed prior to major changes in contracting to ensure MCOs will be able to meet all of the contract expectations to deliver Medicaid services. Readiness Reviews are conducted by HCA staff and consist of in-depth document reviews, onsite visits, and interview questions with key MCO staff to assess the MCO's level of preparedness for fulfilling the scope of work in the contract. Examples of readiness indicators include contracting status with the existing WISe provider network, alignment of the WISe Quality Plan and the MCO Quality Assurance and Performance Improvement projects and processes, and review for due process to ensure compliance with federal and state regulations. After a Readiness Review is completed, HCA can require corrective action for any critical elements that are deemed not ready for implementation. The Readiness Review process was finalized in late October for IMC MCOs and will determine whether an MCO is prepared to implement the scope of work in the new contract for these regions.

In order to continue directing MCOs towards positive WISe outcomes, HCA strengthened the contract language relating to the WISe program in the AH-IMC and IAHFC contracts, effective January 2019 and this contract language has been maintained. Changes included a requirement that MCOs must meet or exceed their monthly caseload target numbers of children and youth served for each of their regions. In addition, MCOs are required to build

and sustain capacity to meet the potential demand for WISe services that exceeds the caseload targets for each of the MCO's contracted regions. If the MCO does not meet these requirements for the month in any of the MCO's contracted regions, the contract specifically requires the MCO to develop and implement a plan to build caseload capacity and/or service intensity and achieve and maintain monthly caseload target numbers and/or service intensity.

**WISe in King County**: Since the initial implementation of WISe in King County, the data from this region has consistently reflected disproportionately low numbers of children and youth accessing WISe and lower levels of service intensity. During 2019, the King County WISe program has undergone a number of changes to improve access to WISe and quality of WISe services.  These improvements include:

- Adding capacity by expanding the WISe provider network and removing barriers for new WISe providers.
- Creating more pathways to WISe with decentralized screenings and enrollments.
- Increasing consistency by transitioning WISe providers to the "state" model by March 1, 2020.
- Establishing the King County WISe Collaborative for staff from King County, Managed Care Organizations (MCOs), and WISe providers to support transition, contract oversight, and performance improvement. The regional FYSPRT Family Tri-lead participates in this meeting and acts as a liaison with the regional King County FYSPRT.

Another system transition in King County is for WISe providers to directly contract with MCOs rather than the county.  In July 2019, accountability for WISe performance and oversight transferred to the MCOs. Between that time and the fall of 2019, the five MCOs decided to begin directly contracting for WISe on March 1, 2020.  As of November 2019, new providers who want to start WISe and are not currently offering WISe in King County, will contract directly with MCOs.

The MCOs are also planning to hold a joint MCO symposium for WISe providers to provide individual training and technical assistance.  These symposiums have been successful in other regions in preparing providers for IMC implementation, and will deliver content on the areas of utilization management, credentialing, billing, critical incidents, and other operational elements.

King County WISe providers continue to address meeting the performance benchmark for service intensity.  In mid-November, through the King County WISe Collaborative, the following strategies were implemented:

- New action plans have already been developed by each WISe provider in King County with a specific focus on service intensity.

- The current action plans will be replaced with service intensity action plans to monitor the results with rapid cycle learning on a weekly basis by the MCOs and King County.
- MCOs will report bi-monthly to HCA during CQI meetings.
- If weekly progress is not made, new strategies will be developed and activated by providers with oversight by the MCOs.

HCA will continue to work closely with MCOs through the CQI process and direct additional action if needed.

2. **Workforce issues continue to pose a challenge, and additional training and coaching approaches are being developed and implemented**

The HCA/WISe team is developing **system targeted approaches to support youth, families, and WISe behavioral health professionals**.  Over the next year the WISe team will continue to convene workgroups and complete resource materials to support the quality of care for specific populations of youth who receive WISe.  Targeted "teaming" approaches are under development to increase access and/or engagement in WISe.  The overall focus is on building state or local structures and processes that increase effectiveness in workforce development for WISe through a variety of approaches.  Areas of focus include:

- WISe and American Indian and Alaskan Native youth and their family.
- Birth to Five years old and WISe.
- Transition Age Youth (TAY) and WISe.
- Autism spectrum disorder (ASD)/Intellectual and Developmental Disabilities (IDD) and WISe "Best Practice."

**WISe and American Indian and Alaskan Native youth and their families:**
In July 2019, the WISe case rate was included in the Tribal Billing Guide.  The billing guide is designed to assist tribal health care facilities and providers to deliver health care services to eligible clients and to bill the Medicaid agency for delivering those services.  The WISe case rate of $3012 is available per youth, per month receiving WISe.

To further the support delivery of WISe through tribal health care facilities, tribal representatives have begun partnering with WISe staff to update the WISe training curriculum to make WISe services more useful for American Indian and Alaska Native youth and their families.

HCA/DBHR is hopeful tribal behavioral health agencies will consider the updated training curriculum and WISe as a service delivery model to include in the array of services they provide.  Anticipated completion date for the updated training curriculum is March 2020.

HCA/DBHR is also working to identify additional resource materials to include on this page to assist non-native WISe practitioners when working with American Indian and Alaska

Native youth and their families.  Links to these resources will be included in the next WISe Manual update.

WISe continues to be available through Fee-For-Service (FFS) by approved WISe agencies offering FFS or through managed care entities if American Indian and Alaska Native families and their youth decide to opt into managed care.

**Birth to Five and WISe**: Providing Wraparound with Intensive Services (WISe) to children younger than five years old presents specific challenges.  Most staff report lacking any training or education on providing mental health interventions for infants and young children and many are not familiar with the diagnostic tools used in this age group (DC 0-5).  There is also limited experience and confidence using the Child and Adolescent Needs and Strengths (CANS) tool used to screen, develop care plans, and monitor functional progress of young children in WISe.  HCA and MCOs have recently brought on WISe providers with expertise in infant and early childhood and delivering therapeutic pre-school services. These agencies are now licensed to provide the full service array of mental health services required under WISe.  These agencies have also been able to recruit staff needed for WISe teams. The state has recently approved Medicaid payment for 'dyadic services' that are delivered to the parent/caregiver of the identified patient (the young child).

**Transition Age Youth (TAY) and WISe**: HCA/DBHR is working with Community Youth Services, a WISe agency specializing in WISe and TAY, and the WISe Workforce Collaborative to provide additional guidance for consideration when working with transition-aged youth.  Information will be provided in the next annual WISe Manual update.

**ASD/IDD and WISe "Best Practice."**  From 2019 BHAS data, nine percent of WISe clients in Washington State identified as also receiving developmental disabilities services including services and supports for autism spectrum disorder or intellectual/ developmental disabilities (ASD/IDD).  These youth often have unique care coordination needs to ensure appropriate delivery of WISe along with other services such as applied behavioral analysis or medical treatments.  At the same time, many mental health practitioners lack training and education on how to effectively serve those with ASD/IDD. HCA in partnership with DSHS/DDA and various stakeholders are developing a series of 'best practice' suggestions for WISe providers to more effectively meet the needs of those with ASD/IDD and who qualify for WISe services.

Beginning in August 2019, the HCA started facilitating meetings to identify best practices when working with the ASD/IDD population. The workgroup is planning to address:

- Access Protocols
- Coordination Protocols
- Training Needs

In September 2019, HCA invited DDA to co-facilitate these workgroup meetings and also participate in consultation meetings with national experts, Suzanne Fields and Liz Manley with the University of Maryland, Technical Assistance Network, to assist in determining a "Best Practice" for WISe. The goal for recommendations and for materials to be included in the WISe Manual is July 2020.

[The remainder of this page is intentionally left blank.]

## II. Preparing for Exit

The State anticipates exiting the Settlement Agreement by June 30, 2020.  In early 2020, the parties will work in collaboration to create an outline for a final report to demonstrate state performance towards meeting T.R. exit criteria.

In addition to preparing documentation for exit, the State will focus on exit benchmarks identified by the parties' stipulations.  These primary areas include: 1) WISe Service Intensity, 2) BRS and WISe screening rates, and 3) on-going demonstration of an operational WISe Quality Plan. Attention will be given to these areas while maintaining and/or building on already existing WISe implementation successes statewide.

### *Access and Service Delivery*

In the April 2018 Stipulation to the Court, the parties agreed "utilization for WISe is reached when the annual unduplicated caseload is 82.5% of the estimated number of class members to be served."

The agreement notes that the number of children/youth to receive services is 7000 annually. For the purposes of translating between annual unduplicated and monthly caseload, HCA is using nine months as the average WISe service duration, with the monthly caseload target of 3150. To meet substantial compliance, at least 2600 youth need to be receiving WISe monthly. October 2019 enrollment reports from Managed Care Organizations show over 2600 youth receive WISe monthly, which would meet the monthly caseload service target in the settlement agreement.  These monthly service target numbers will be further validated as encounter data matures. With the addition of new WISe providers and expansion of teams with existing providers, the State expects an increase in the monthly caseload for WISe over the next year.

In addition to the benchmark of numbers served, every region must maintain an average of nine service hours a month or above, and the overall average statewide must be at least 10.5 hours per month.  This requirement is intended to ensure that the children being counted as "receiving WISe" are getting WISe services consistent with the Practice Model and not other less intensive, less appropriate treatment.  In the September 2019 Service Intensity Report, WISe service intensity has increased across the state. The statewide three-month moving average number of service hours per youth per WISe service month was 11.0 in April 2019. This average varied among regions, ranging from 7.7 hours per service month in North Central to 12.9 hours per service month in Pierce.  One region, North Central, is below the benchmark for substantial compliance. HCA and MCOs are working with the three providers in this region to assist with strategies to stabilize workforce retention issues and identify strategies to reach the monthly service average.

King County Service Intensity data is under review and an updated report is forthcoming. RDA has determined that the average service hours reported for King County in the September 2019 Service Intensity Report are inaccurate. Data errors were discovered in

the January 2019 - June 2019 reporting timeframe where service units on mental health service encounters from King County were frequently reported in minutes rather than units.  For many encounters, this type of reporting is both inconsistent with historical data, as well as inconsistent with HCA's Service Encounter Reporting Instructions (SERI). These coding errors indicated higher WISe intensity numbers for King County for January - April 2019 than were previously reported.

### BRS/WISe

In July 2019, measurable exit criteria related to Paragraph 69(c) was established and submitted to the court.  HCA and DCYF have worked diligently to prepare the workforce to provide BRS and WISe concurrently and the coordination of these services started statewide in October 2019.  Requirements for BRS and WISe providers are:

- As of October 1, 2019, for youth entering into BRS who screen eligible for WISe (and if 13 and older, consent) are to receive WISe and BRS concurrently.
- As of October 1, 2019, class members who screen eligible for WISe and are already receiving BRS are being offered CFTs monthly until WISe is provided.

Additionally, new benchmarks for 69(c) established in July 2019 are:

- 90% of the children/youth will have been screened for WISe prior to placing a child in BRS in state or placement in an out-of-state facility-based services. Reasons for placement in BRS when a child/youth screens eligible for WISe will be tracked in BHAS. This requirement will be fully achieved when the Defendants reach an average of 90% in three consecutive months prior to exit.
- 90% of the children/youth served in BRS placements and/or out-of-state services will have been screened for WISe as a part of discharge planning, if not already receiving WISe. This requirement will be fully achieved when the Defendants reach an average of 90% in three consecutive months prior to exit.

HCA, DCYF, and Coordinated Care of WA, the plan for Apple Health Integrated Foster Child Managed Care program, are working in partnership to create a proactive monitoring system of youth entering and exiting BRS and completion of WISe screens.  With the small numbers of youth of entering and exiting BRS monthly, it will require continuous monitoring and coordination to demonstrate and maintain 90% completion.

### Quality Management

During the 12-month extension (July 1, 2019 - June 30, 2020) HCA will continue to track and report to Plaintiffs' counsel on a quarterly basis WISe services denials, delays (including waiting times), or reductions in intensity, scope, or duration, primarily due to insufficient service capacity.

Quarterly reports were provided to Plaintiffs' Counsel in September 2019; the Quarterly Due Process report was shared in November 2019.  Plaintiffs' Counsel will be provided

reports again prior to January 2020 T.R. Implementation Advisory Group (TRIAGe) meeting.

[Remainder of this page intentionally left blank.]

### III. Glossary of Key Terms

**Definitions**: The words and phrases listed below have the following definitions:

1. **"Behavioral Health Assessment Solution" or "BHAS"** is an online data system to store and report on Child and Adolescent Needs and Strengths (CANS) data for Wraparound with Intensive Services (WISe).

2. **"Behavioral Health Organizations" or "BHOs"** are created by state law to purchase and administer public mental health and substance use disorder services under managed care. BHOs are single, local entities that assume responsibility and financial risk for providing substance use disorder treatment, and the mental health services previously overseen by the Regional Support Networks (RSNs).

3. **"Behavior Rehabilitation Services" or "BRS"** is a temporary intensive wraparound support and treatment program for youth with high-level service needs. BRS is used to stabilize youth (in-home or out-of-home) and assist in achieving their permanent plan. These services are offered through contracts under DCYF.

4. **"Child and Adolescent Needs and Strengths" or "CANS"** is a multi-purpose tool developed for children's services to support decision making, including level of care and service planning, to facilitate quality improvement initiatives, and to allow for the monitoring of outcomes of services.

5. **"Child and Family Team" or "CFT"** includes the youth, parents/caregivers, relevant family members, and natural and community supports.

6. **"Children's Long-term Inpatient Program" or "CLIP"** is the most intensive inpatient psychiatric treatment available to all Washington residents, ages 5-18 years of age; offers a medically based treatment approach providing 24-hour psychiatric care staffed by psychiatrists, Master-level social workers, RNs, and other clinical experts.

7. **"Coordinated Care of Washington" or "CCW"** is a Managed Care Organization (MCO) that will provide behavioral health services for all youth in foster care statewide via the Apple Health Foster Care plan, starting January 1, 2019. CCW will also offer a behavioral health services plan available to Medicaid clients in the Greater Columbia, King, North Central, North Sound, and Pierce regions.

8. "**Culturally and Linguistically Appropriate Services" or "CLAS"** – These national standards are intended to advance health equity, improve quality, and help eliminate health care disparities by providing a blueprint for individuals and health and health care organizations to implement culturally and linguistically appropriate services. Adoption of these standards will help

advance better health and health care.
https://www.thinkculturalhealth.hhs.gov/clas

9.   **"Developmental Disabilities Administration" or "DDA"** is an administration of the Department of Social and Health Services that provides services and programs for state residents with developmental disabilities and their families. https://www.dshs.wa.gov/dda/consumers-and-families/services-and-programs-non-residential

10.  **"Division of Behavioral Health and Recovery" or "DBHR"** means the division within the Health Care Authority, the Medicaid authority for the State, whose staff are behavioral health subject matter experts.  DBHR was previously part of the Department of Social and Health Services (DSHS) Behavioral Health Administration (BHA) and transitioned to HCA on July 1, 2018.

11.  **"Department of Children, Youth, and Families" or "DCYF"** means the cabinet-level agency focused on the well-being of children. DCYF, established in July 2018, holds a mission and vision to ensure that "Washington State's children and youth grow up safe and healthy—thriving physically, emotionally and academically, nurtured by family and community." DCYF currently includes the former Department of Early Learning and Children's Administration of DSHS; in July 2019, DCYF included the Division of Juvenile Rehabilitation and the Office of Juvenile Justice, previously part of the Department of Social and Health Services (DSHS).

12.  **"External Quality Review Organization" or "EQRO"** provides external quality review and supports quality improvement for services provided to Medicaid enrollees in Washington; the work supports the state of Washington Health Care Authority (HCA) and Department of Social and Health Services (DSHS) Division of Behavioral Health and Recovery.

13.  **"Family Youth and System Partner Round Tables" or "FYSPRTs"** provide an equitable forum for families, youth, systems, and communities to strengthen sustainable resources by providing community-based approaches to address the individualized behavioral health needs of children, youth, and families.

14.  **"Fiscal Year"** is the time period running from July 1 through June 30 each year.

15.  **"Full partners"** are persons or entities who play an active role in the development and implementation of activities under the *T.R. v. Birch and Strange* (formerly Dreyfus and Porter) Settlement Agreement. Full partners have the same access to data and equal rights in the decision-making processes as other members of the Governance structure.

16.  The **"Governance Structure"** consists of inter-agency members on an executive team of state administrators, the statewide, regional, and local FYSPRTs, an

advisory team, and various policy workgroups who inform and provide oversight for high-level policy-making, program planning, and decision making in the design, development, and oversight of behavioral health care services and for the implementation of the *T.R. v. Birch and Strange* settlement agreement.

17. "**Health Care Authority" or "HCA"** purchases health care for more than 2 million Washingtonians through two programs — Washington Apple Health (Medicaid) and the Public Employees Benefits Board (PEBB) Program. As of July 1, 2018, HCA includes the Division of Behavioral Health and Recovery (DBHR), which was previously part of the Department of Social and Health Services (DSHS)

18. **Managed Care Entity(s) or "MCEs"**- A term used to collectively refer to Behavioral Health Organizations (BHOs) and Fully Integrated Managed Care Organizations (MCOs).

19. **Managed Care Organizations or "MCOs"** are health care providers or a group or organization of medical service providers who offers managed care health plans. It finances and delivers health care using a specific provider network and specific services and products.

20. **"Quality Improvement Review Tool" or "QIRT"** is a file review tool developed by DBHR for use with WISe documentation. The QIRT is designed to provide feedback on the extent to which documented practices are consistent with the WISe practice model.

21. **"Quality Plan" or "QP"** prescribes the quality management goals, objectives, tools, resources, and processes needed to measure the implementation and success of the commitments set forth in the *T.R. v. Birch and Strange* settlement agreement.

22. **"System of Care" or "SOC"** is a spectrum of effective, community-based services and supports for children and youth with or at risk for mental health or other challenges and their families, that is organized into a coordinated network to build meaningful partnerships with families and youth and address their cultural and linguistic needs in order to help them to function better at home, in school, in the community, and throughout life.

23. **"T.R. Implementation Advisory Group" or "TRIAGe"** is a group comprised of the Plaintiffs' Counsel, Attorney General Representatives, and representatives of HCA, Department of Child, Youth and Families and DSHS child-serving administrations (DDA and RA) who have knowledge relevant to the services and processes identified in the WISe Implementation Plan. TRIAGe is used as a communication mechanism between parties to enable implementation.

24. **"T.R. v. Birch and Strange (formerly Dreyfus and Porter) Settlement Agreement"** is a legal document stating objectives to develop and successfully implement a plan that delivers Wraparound with Intensive Services (WISe) and other supports statewide consistent with Washington State Children's Behavioral Health Principles.

25. **"Tri-Lead"** is a role developed to create equal partnership, among a family, a transition age youth and/or youth partner, and a system partner representative who share leadership in organizing and facilitating FYSPRT meetings and action items.

26. **"Washington State Children's Behavioral Health Principles"** are a set of standards, grounded in the system of care values and principles, which guide how the children's behavioral health system delivers services to youth and families. The Washington State Children's Behavioral Health Principles are:
    - Family and Youth Voice and Choice
    - Team Based
    - Natural Supports
    - Collaboration
    - Home- and Community-based
    - Culturally Relevant
    - Individualized
    - Strengths Based
    - Outcome-based
    - Unconditional

27. **"WISe Workforce Collaborative"** means a staffing infrastructure that operates independently and is tri-led by youth and families, state systems, and partner universities to develop sustainable local and statewide education, training, coaching, mentoring, and technical assistance.

28. **"Wraparound with Intensive Services" or "WISe"** means intensive mental health services and supports, provided in home and community settings, for Medicaid eligible individuals, up to 21 years of age, with complex behavioral health needs and their families, in compliance with the *T.R. v. Birch and Strange* settlement agreement.

## IV. Attachments

The following documents, filed with the court earlier this year, are attached to this report to facilitate reference:

- Stipulation Regarding Clarifications to the Parties' Settlement Agreement, previously filed with the court on April 23, 2018 (*see pages 39 – 42*).
- Final Mediation Agreements as of March 27, 2018, previously filed with court as an exhibit attached to the above stipulation (*see pages 43 – 46*).
- Stipulation regarding amended clarifications to the Parties Settlement Agreement July 1, 2019 (*see pages 47 – 50*).
- Final Mediation Agreements as of April 6, 2018 with June 13, 2019 Amendments (*see pages 51 – 56*).

[The remainder of this page is intentionally left blank.]

THE HON. THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| T.R., by and through his guardian and next friend, R.R.; S.P., by and through her mother and next friend, D.H.; C.A., by and through her mother and next friend, A.A.; T.F., by and through her father and next friend, D.F.; P.S., by and through his mother and next friend, W.S.; T.V., by and through his guardian and next friend. C.D.; E.H. by and through his mother and next friend, C.H.; E.D., by and through his mother and next friend, A.D.; and L.F.S., by and through his mother and next friend, B.S., | No. C09-1677-TSZ |
| Plaintiffs, | **STIPULATION REGARDING CLARIFICATIONS TO THE PARTIES' SETTLEMENT AGREEMENT** |
| v. | |
| CHERYL STRANGE, not individually, but solely in her official capacity as Secretary of the Washington State Department of Social and Health Services; and SUSAN E. BIRCH, not individually, but solely in her official capacity as the Director of the Washington State Health Care Authority, | |
| Defendants. | |

The parties respectfully submit this Stipulation Regarding Clarifications to the Parties' Settlement Agreement to apprise this Court of the status of the parties' settlement implementation efforts.

STIPULATION RE CLARIFICATIONS TO SETTLEMENT
AGREEMENT  - 1

National Center for Youth Law
405 14th Street, 15th floor
Oakland, CA 94612
(510) 835-8099 – Fax: (510_835-8099

On December 19, 2013, the Court approved the parties' Settlement Agreement (Dkt. 119-1), calling it a "resounding success" and "nothing less than a landmark reform". Verbatim Report of Proceedings at 25, *T.R. v. Quigley*, No. C09-1677TSZ (W.D. Wash. Dec. 19, 2013). Under the terms of the Settlement Agreement, Defendants agreed to develop a program and deliver intensive mental health services, called Wraparound with Intensive Services ("WISe"), to Medicaid-eligible children in Washington statewide. Dkt. 119-1, ¶ 1. Defendants have submitted annual reports each year apprising the Court of the status of the settlement implementation efforts. Dkts. 149, 159, 166, and 170.

Pursuant to Paragraph 66 of the Settlement Agreement, in May 2017, the parties began discussions regarding "whether the Defendants are on track to meet the exit criteria" set forth in paragraphs 67-72 of the Settlement Agreement. After several calls and in-person meetings, the parties enlisted mediator Kathleen Noonan to assist with assist in resolving disagreements about the status of implementation efforts. See Dkt. 119-1, ¶ 75.

On March 8 and 9, 2018, the parties attended two full days of in-person mediation with Ms. Noonan. Following those in-person meetings, the parties had several phone calls with Ms. Noonan and one another. On April 6, 2018, the parties executed an agreement that clarified various exit criteria and related Settlement Agreement terms. The parties' agreement acknowledged that Defendants will not have completed all exit criteria by the original anticipated completion date of June 2018. Defendants now expect to achieve substantial compliance by June 30, 2019. The parties' agreement defined a set of tasks that must be completed in order to demonstrate substantial compliance with the exit criteria. The parties' agreement does not amend the Settlement Agreement.

The parties respectfully submit a copy of the parties' executed agreement as Exhibit A to this Stipulation.

Respectfully submitted this 23rd day of April, 2018.

STIPULATION RE CLARIFICATIONS TO SETTLEMENT AGREEMENT  - 2

National Center for Youth Law
405 14th Street, 15th floor
Oakland, CA 94612
(510) 835-8099 – Fax: (510_835-8099

| | |
|---|---|
| **For Plaintiffs:** | **For Defendants:** |
| /s/Susan Kas | /s/ Eric Nelson |
| Susan Kas, WSBA No. 36592 | ERIC NELSON, WSBA No. 27183 |
| David Carlson, WSBA No. 35767 | JENNIFER S. MEYER, WSBA No. 27057 |
| susank@dr-wa.org | EricN1@atg.wa.gov |
| davidc@dr-wa.org | JenniS1@atg.wa.gov |
| **DISABILITY RIGHTS** | Assistant Attorneys General |
| **WASHINGTON** | Attorneys for Defendants |
| 315 5th Avenue South, Suite 850 | |
| Seattle, WA 98104 | Office of the Attorney General |
| Telephone: (206) 324-1521 | 7141 Cleanwater Drive SW |
| Facsimile: (206) 957-0729 | PO Box 40124 |
| | Olympia, WA 98504-0124 |
| /s/Leecia Welch | Telephone: (360) 586-6565 |
| Leecia Welch, WSBA No. 26590 | |
| lwelch@youthlaw.org | |
| **NATIONAL CNTR FOR YOUTH** | |
| **LAW** | |
| 405 14th Street, 15th Floor | |
| Oakland, CA 94612 | |
| Telephone: (510) 835-8098 | |
| Facsimile: (510) 835-8099 | |
| | |
| /s/Patrick Gardner | |
| Patrick Gardner, CB No. 208199 | |
| Patrick@youngmindsadvocacy.org | |
| **YOUNG MINDS ADVOCACY** | |
| **PROJECT** | |
| 115 Haight Street | |
| Menlo Park, CA 92025 | |
| Telephone: (650) 494-4030 | |
| | |
| /s/ Kimberly Lewis | |
| Kimberly Lewis, CB No. 144879 | |
| lewis@healthlaw.org | |
| **NATIONAL HEALTH LAW** | |
| **PROGRAM** | |
| 3701 Wilshire Blvd, Suite 750 | |
| Los Angeles, CA 90010 | |
| Telephone: (310) 736-1653 | |
| Facsimile: (213) 368-0774 | |

STIPULATION RE CLARIFICATIONS TO SETTLEMENT
AGREEMENT  - 3

National Center for Youth Law
405 14th Street, 15th floor
Oakland, CA 94612
(510) 835-8099 – Fax: (510_835-8099

41

1

## CERTIFICATE OF SERVICE

2  I hereby certify that on this 23rd day of April, 2018, I electronically filed the foregoing

3  with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

   to the following:

4

5            Eric Nelson (EricN1@atg.wa.gov)
             Jennifer Smith Meyer (jennies!@atg.wa.gov)

6

7       Dated this 23rd day of April, 2018 at Oakland, California.

8

                         *s/ Kira Setren*

9                        Paralegal
                         National Center for Youth Law

10

11

12

13

14

15

16

17

18

19

20

21

22

23

STIPULATION RE CLARIFICATIONS TO SETTLEMENT           National Center for Youth Law
AGREEMENT - 4                               405 14th Street, 15th floor
                                             Oakland, CA 94612
                      (510) 835-8099 – Fax: (510_835-8099

Re:   TR v. Birch & Strange – Final Mediation Agreements as of March 27, 2018

---

## I.   Access and Service Delivery.

1. For purposes of demonstrating Defendants have substantially complied with the exit criteria in Paragraphs 67(i) and (j) of the Settlement Agreement, the parties agree that:

   a. Utilization for WISe is reached when the annual unduplicated caseload[1] is 82.5% of the estimated number of class members to be served. The parties agree that until June 30, 2019, the estimated number of class members to be served will be 7,000 annually, and the Defendants will have reached utilization if by that time, the monthly caseload count is 2,600. Should substantial compliance not be achieved by June 30, 2019, the annual service target will be adjusted on an annual basis to reflect the most recently available annual caseload growth rate for Washington's age 0-20 Medicaid population.

   b. The average statewide WISe service intensity must be no lower than 10.5 hours per month, but no Region will have an average service intensity lower than 9 hours per month.

## II.   Due Process.

1. To meet the requirement in Paragraph 68(d) of the Settlement Agreement and Paragraph 3, Objective 7 of the Implementation Plan, and to address the non-compliance by the BHOs/MCOs with due process requirements, the State will routinely monitor the BHOs/MCOs compliance with due process requirements by taking all of the following steps:

   a. Requiring quarterly quality reports from the BHO/MCO that includes data regarding Notices (NOABDs) and Appeals.

   b. Identifying policies or practices by the BHOs/MCOs or providers that violate the state and federal due process requirements.

   c. If informal efforts at remediation fail, take corrective action measures (including requiring a corrective action plan by the BHO/MCO) to address and remediate non-compliance by the

---

[1] For the purposes of translating between annual unduplicated and monthly unduplicated WISe caseload, the state will use 9 months as its average WISe service duration.

BHO/MCO with notice and appeals requirements in the Settlement Agreement and state and federal law.

## III.   Quality Management Plan.

1. The parties agree that the Exit Criteria require Defendants to be operating a quality assurance (management) system consistent with the Quality Assurance Plan, now called the Quality Management Plan (QMP).

2. The parties will use the March 2018 QMP update proposal by the State as a starting point for amendments. Plaintiffs will have ten business days after the effective date of this agreement to propose additional items or elaborations for consideration in the process. Amendments cannot enlarge or increase the State's obligations under the Settlement Agreement.

3. The parties agree to amend the QMP such that:

   a. Items for which the State has not complied will be either updated for future compliance, or deleted as no longer relevant; and

   b. The amendments will be adopted only by consensus of Plaintiffs and Defendants, using Kathleen Noonan as mediator if necessary.

 It is expected that the process will be completed by June 15, 2018 subject to mediator availability.

## IV.   TRIAGe/Process

1. Plaintiffs' counsel meetings with the State will be held in person on a quarterly basis. Plaintiffs' counsel monthly conference calls will no longer be held, unless agreed to between both parties. In person meetings will be facilitated by the mediator, subject to her availability, and will seek to focus on either outstanding exit issues including finalization of the QMP or barriers to implementation. Contact between the parties will continue on an as needed basis.

2. The November 2018 Court Report, and related exchanges, can suffice for the winter TRIAGE meeting; the parties expect to hold two in person quarterly meetings before the November 2018 Court Report is filed.

3. Data and reports to Plaintiffs counsel will continue to include those listed in Paragraph 85 (referencing Paragraphs 25, 27, 48, 50, 51, 54(b), 59 and 60) of the Settlement Agreement. For other data, the parties should adhere to Paragraph 86.

4. The parties agree to the following decision rule about requests for feedback and comments: the sending party will identify a timeline for feedback and comments, and the receiving party will make its best efforts to respond to the timeline. Extensions will be granted when reasonable.

5. Defendants agree that they will continue to make good faith efforts to negotiate the amount of attorneys' fees and costs pursuant to Paragraph 89 of the Settlement Agreement, including requests by Plaintiffs' counsel for attorneys' fees and costs post June 30, 2018.

6. The State has notified Plaintiffs' Counsel that it expects to reach substantial compliance by June 30, 2019. The State will notify Plaintiffs' Counsel by the Spring 2019 quarterly meeting if it believes it will not meet this good faith estimate of when substantial compliance will be reached. The parties acknowledge that June 30, 2019, is the state's good faith estimate based on information known in March 2018. Notwithstanding the foregoing, the State reserves the right to initiate the exit procedure earlier than June 30, 2019, by setting a Paragraph 66 meeting in accord with the Settlement Agreement. To the extent the Parties reach new agreements about the Quality Management Plan and Paragraph 69(c) of the Settlement Agreement, the State's estimate of June 30th, 2019 may require amendment.

## V.  WISe/BRS Integration.

1. CA has developed a work plan for a BRS/WISe pilot. The work plan is expected to have leadership approval within 45 days and the pilot is expected to launch by October 1st, 2018.

2. In an additional effort, CA, in conjunction with DBHR and HCA, is conducting work to consider how WISe components can be incorporated into the BRS program. This work includes considering 1) how BRS providers could conduct child and family team meetings every 30 days, 2) how peer support could be made available in BRS, 3) how training on CANs screens or other tools could be offered to BRS providers for use in CFTs and how such information could inform case and discharge planning. Program staff are looking at whether there are other ways in which WISe components can be incorporated into BRS, to the extent WISe is not available or cannot be utilized.

3. The State expects to propose measurable exit criteria related to Para. 69(c) by May 18, 2018, so that the parties can discuss and reach agreement at the June 2018 TRIAGe meeting.

4. CA is updating policies and procedures related to out of state services for youth to include 1) WISe screening prior to out-of-state placement, 2) routine reviews during out-of-state placement, and 3) planning to support timely transition to WISe or in state services consistent with the WISe access protocol.

**TR MEDIATION DOCUMENT**
**SUBJECT TO CONFIDENTIALITY TERMS**
**AS AGREED TO BY MEDIATOR AND PARTIES**

**PLAINTIFFS' COUNSEL**

_____          4/6/18
Susan Kas                                  Date
Disability Rights Washington
WSBA No. 36592


_____          _____
Leecia Welch                               Date
National Center for Youth Law
WSBA No. 26590

_____          4-C-18
Kimberly Lewis                             Date
National Health Law Program
CB No. 144879

_____          4-5-2018
Patrick Gardner                            Date
Young Minds Advocacy Project
CB No. 208199

**DEFENDANTS' COUNSEL**

_____          4-6-18
Eric Nelson    /Jennifer S. Meyer          Date
Assistant Attorney General
WSBA No. 27183

THE HON. THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| T.R., by and through his guardian and next friend, R.R.; S.P., by and through her mother and next friend, D.H.; C.A., by and through her mother and next friend, A.A.; T.F., by and through her father and next friend, D.F.; P.S., by and through his mother and next friend, W.S.; T.V., by and through his guardian and next friend. C.D.; E.H. by and through his mother and next friend, C.H.; E.D., by and through his mother and next friend, A.D.; and L.F.S., by and through his mother and next friend, B.S., <br><br> Plaintiffs, <br><br> v. <br><br> CHERYL STRANGE, not individually, but solely in her official capacity as Acting Secretary of the Washington State Department of Social and Health Services; and SUSAN BIRCH, not individually, but solely in her official capacity as the Director of the Washington State Health Care Authority, <br><br> Defendants. | No. C09-1677-TSZ <br><br><br> **STIPULATION REGARDING AMENDED CLARIFICATIONS TO THE PARTIES' SETTLEMENT AGREEMENT** |

The parties respectfully submit this Stipulation Regarding Amended Clarifications to the Parties' Settlement Agreement to apprise this Court of the status of the parties' settlement implementation efforts.

Upon the Court's December 19, 2013, approval of the parties' Settlement Agreement (Dkt. # 119-1), the Defendants have been implementing their commitments to develop a program

STIPULATION RE AMENDED CLARIFICATIONS TO
SETTLEMENT AGREEMENT  - 1
C09-1677 TSZ

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington  98104
(206) 324-1521 · Fax: (206) 957-0729

1  and deliver intensive mental health services, called Wraparound with Intensive Services ("WISe"),

2  to Medicaid-eligible children in Washington statewide. Dkt. # 119-1, ¶ 1Verbatim Report of

3  Proceedings at 25, *T.R. v. Quigley*, No. C09-1677TSZ (W.D. Wash. Dec. 19, 2013); *See also*

4  Annual reports regarding status of the settlement implementation efforts. Dkts. # 149, 159, 166,

   170, and 177.

5      On April 23, 2018, the parties filed their Stipulation Regarding Clarifications to the Parties'

6  Settlement Agreement, attaching their mediation agreements defining the set of tasks that must be

7  completed in order to demonstrate substantial compliance with the exit criteria established under

8  paragraphs 67-72 of the Settlement Agreement. Dkt. # 171. At that time, the parties intended to

9  reach further agreements for measuring exit criteria related to paragraph 69(c) of the Settlement

   Agreement, and the Defendants anticipated completing all of the agreed upon tasks to demonstrate

10 substantial compliance by June 30, 2019. Dkt. # 171-1, ¶¶ IV.6, V.3.

11     Pursuant to the parties' mediation agreements, Defendants have notified Plaintiffs' counsel

12 that substantial compliance will not be reached by their good faith estimate of June 30, 2019. *See*

13 Dkt. # 171-1, ¶ IV.6. In addition, the parties have continued to negotiate regarding the Defendants'

14 tasks for satisfying the exit criteria set forth in paragraph 69(c) of the Settlement Agreement. As

15 such, the parties have negotiated an addendum to their April 6, 2018, mediation agreements, which

16 includes, inter alia, agreements regarding paragraph 69(c) of the Settlement Agreement and a

17 modification of the Defendants' estimated completion date.

18     The parties respectfully submit a copy of their April 6, 2018, mediation agreement along

   with an executed June 26, 2019 addendum as Exhibit A to this Stipulation.

19     Respectfully submitted this 1st day of July, 2019.

20

21

22

23

STIPULATION RE AMENDED CLARIFICATIONS TO
SETTLEMENT AGREEMENT  - 2
C09-1677 TSZ

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington  98104
(206) 324-1521  ·  Fax: (206) 957-0729

48

| **For Plaintiffs:** | **For Defendants:** |
|---|---|
| /s/Susan Kas | /s/ Eric Nelson |
| Susan Kas, WSBA No. 36592 | ERIC NELSON, WSBA No. 27183 |
| David Carlson, WSBA No. 35767 | ANGELA COATS-MCCARTHY, WSBA No. |
| susank@dr-wa.org | 35547 |
| davidc@dr-wa.org | Eric.Nelson@atg.wa.gov |
| **DISABILITY RIGHTS** | Angela.Coats-McCarthy@atg.wa.gov |
| **WASHINGTON** | Assistant Attorneys General |
| 315 5th Avenue South, Suite 850 | Attorneys for Defendants |
| Seattle, WA  98104 | |
| Telephone: (206) 324-1521 | Office of the Attorney General |
| Facsimile: (206) 957-0729 | 7141 Cleanwater Drive SW |
| | PO Box 40124 |
| /s/Leecia Welch | Olympia, WA 98504-0124 |
| Leecia Welch, WSBA No. 26590 | Telephone:  (360) 586-6565 |
| lwelch@youthlaw.org | |
| **NATIONAL CNTR FOR YOUTH** | |
| **LAW** | |
| 405 14th Street, 15th Floor | |
| Oakland, CA  94612 | |
| Telephone: (510) 835-8098 | |
| Facsimile: (510) 835-8099 | |
| | |
| /s/Patrick Gardner | |
| Patrick Gardner, CB No. 208199 | |
| Patrick@youngmindsadvocacy.org | |
| **YOUNG MINDS ADVOCACY** | |
| **PROJECT** | |
| 115 Haight Street | |
| Menlo Park, CA 92025 | |
| Telephone: (650) 494-4030 | |
| | |
| /s/ Kimberly Lewis | |
| Kimberly Lewis, CB No. 144879 | |
| lewis@healthlaw.org | |
| **NATIONAL HEALTH LAW** | |
| **PROGRAM** | |
| 3701 Wilshire Blvd, Suite 750 | |
| Los Angeles, CA 90010 | |
| Telephone: (310) 736-1653 | |
| Facsimile: (213) 368-0774 | |

STIPULATION RE AMENDED CLARIFICATIONS TO
SETTLEMENT AGREEMENT  - 3
C09-1677 TSZ

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington  98104
(206) 324-1521  ·  Fax: (206) 957-0729

## CERTIFICATE OF SERVICE

I hereby certify that on July ⟋ , 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Susan Linn Kas            susank@dr-wa.org
David Carlson             davidc@dr-wa.org
Wesley Sheffield          wsheffield@youngmindsadvocacy.org
Patrick Gardner           pgardner@adolescentmentalhealth.org
Martha Jane Perkins       perkins@healthlaw.org
Kimberly Lewis            lewis@healthlaw.org
Leecia Welch              lwelch@youthlaw.org

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this ⟋$^{st}$ day of July 2019, at Tumwater, Washington.

CHRISTINE HAWKINS
Legal Assistant

STIPULATION RE AMENDED CLARIFICATIONS TO
SETTLEMENT AGREEMENT - 4
C09-1677 TSZ

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington 98104
(206) 324-1521 · Fax: (206) 957-0729

50

TR MEDIATION DOCUMENT
As of April 6, 2018 with June 26, 2019 Amendments

Re:     TR v. Birch & Strange – Final Mediation Agreements as of April 6, 2018 with June 13, 2019
Amendments

I.    **Access and Service Delivery.**

1.  For purposes of demonstrating Defendants have substantially complied with the exit criteria in
    Paragraphs 67(i) and (j) of the Settlement Agreement, the parties agree that:

    a.  Utilization for WISe is reached when the annual unduplicated caseload[1] is 82.5% of the
        estimated number of class members to be served. The parties agree that until June 30,
        2019, the estimated number of class members to be served will be 7,000 annually, and the
        Defendants will have reached utilization if by that time, the monthly caseload count is
        2,600. Should substantial compliance not be achieved by June 30, 2019, the annual service
        target will be adjusted on an annual basis to reflect the most recently available annual
        caseload growth rate for Washington's age 0-20 Medicaid population.

    b.  The average statewide WISe service intensity must be no lower than 10.5 hours per month,
        but no Region will have an average service intensity lower than 9 hours per month.

II.   **Due Process.**

1.  To meet the requirement in Paragraph 68(d) of the Settlement Agreement and Paragraph 3,
    Objective 7 of the Implementation Plan, and to address the non-compliance by the BHOs/MCOs
    with due process requirements, the State will routinely monitor the BHOs/MCOs compliance
    with due process requirements by taking all of the following steps:

    a.  Requiring quarterly quality reports from the BHO/MCO that includes data regarding Notices
        (NOABDs) and Appeals.

    b.  Identifying policies or practices by the BHOs/MCOs or providers that violate the state and
        federal due process requirements.

    c.  If informal efforts at remediation fail, take corrective action measures (including requiring a
        corrective action plan by the BHO/MCO) to address and remediate non-compliance by the

---

[1]For the purposes of translating between annual unduplicated and monthly unduplicated WISe caseload, the state
will use 9 months as its average WISe service duration.

TR MEDIATION DOCUMENT
As of April 6, 2018 with June 26, 2019 Amendments

BHO/MCO with notice and appeals requirements in the Settlement Agreement and state and federal law.

III.   **Quality Management Plan.**

1.  The parties agree that the Exit Criteria require Defendants to be operating a quality assurance (management) system consistent with the Quality Assurance Plan, now called the Quality Management Plan (QMP).

2.  The parties will use the March 2018 QMP update proposal by the State as a starting point for amendments.  Plaintiffs will have ten business days after the effective date of this agreement to propose additional items or elaborations for consideration in the process. Amendments cannot enlarge or increase the State's obligations under the Settlement Agreement.

3.  The parties agree to amend the QMP such that:

    a.  Items for which the State has not complied will be either updated for future compliance, or deleted as no longer relevant; and

    b.  The amendments will be adopted only by consensus of Plaintiffs and Defendants, using Kathleen Noonan as mediator if necessary.

2.  It is expected that the process will be completed by June 15, 2018 subject to mediator availability.

IV.   **TRIAGe/Process**

1.  Plaintiffs' counsel meetings with the State will be held in person on a quarterly basis. Plaintiffs' counsel monthly conference calls will no longer be held, unless agreed to between both parties. In person meetings will be facilitated by the mediator, subject to her availability, and will seek to focus on either outstanding exit issues including finalization of the QMP or barriers to implementation. Contact between the parties will continue on an as needed basis.

2.  The November 2018 Court Report, and related exchanges, can suffice for the winter TRIAGE meeting; the parties expect to hold two in person quarterly meetings before the November 2018 Court Report is filed.

3.  Data and reports to Plaintiffs counsel will continue to include those listed in Paragraph 85 (referencing Paragraphs 25, 27, 48, 50, 51, 54(b), 59 and 60) of the Settlement Agreement. For other data, the parties should adhere to Paragraph 86.

TR MEDIATION DOCUMENT
As of April 6, 2018 with June 26, 2019 Amendments

4.  The parties agree to the following decision rule about requests for feedback and comments: the sending party will identify a timeline for feedback and comments, and the receiving party will make its best efforts to respond to the timeline. Extensions will be granted when reasonable.

5.  Defendants agree that they will continue to make good faith efforts to negotiate the amount of attorneys' fees and costs pursuant to Paragraph 89 of the Settlement Agreement, including requests by Plaintiffs' counsel for attorneys' fees and costs post June 30, 2018.

6.  The State has notified Plaintiffs' Counsel that it expects to reach substantial compliance by June 30, 2019. The State will notify Plaintiffs' Counsel by the Spring 2019 quarterly meeting if it believes it will not meet this good faith estimate of when substantial compliance will be reached. The parties acknowledge that June 30, 2019, is the state's good faith estimate based on information known in March 2018. Notwithstanding the foregoing, the State reserves the right to initiate the exit procedure earlier than June 30, 2019, by setting a Paragraph 66 meeting in accord with the Settlement Agreement. To the extent the Parties reach new agreements about the Quality Management Plan and Paragraph 69(c) of the Settlement Agreement, the State's estimate of June 30th, 2019 may require amendment.

V.  **WISe/BRS Integration.**

1.  CA has developed a work plan for a BRS/WISe pilot. The work plan is expected to have leadership approval within 45 days and the pilot is expected to launch by October 1st, 2018.

2.  In an additional effort, CA, in conjunction with DBHR and HCA, is conducting work to consider how WISe components can be incorporated into the BRS program. This work includes considering 1) how BRS providers could conduct child and family team meetings every 30 days, 2) how peer support could be made available in BRS, 3) how training on CANs screens or other tools could be offered to BRS providers for use in CFTs and how such information could inform case and discharge planning.  Program staff are looking at whether there are other ways in which WISe components can be incorporated into BRS, to the extent WISe is not available or cannot be utilized.

3.  The State expects to propose measurable exit criteria related to Para. 69(c) by May 18, 2018, so that the parties can discuss and reach agreement at the June 2018 TRIAGe meeting.

4.  CA is updating policies and procedures related to out of state services for youth to include 1) WISe screening prior to out-of-state placement, 2) routine reviews during out-of-state placement, and 3) planning to support timely transition to WISe or in state services consistent with the WISe access protocol.

TR MEDIATION DOCUMENT
As of April 6, 2018 with June 26, 2019 Amendments

VI.    2019 ADDENDUM

The parties agree that satisfaction of the following benchmarks will demonstrate substantial compliance with paragraphs 28 and 69(c) of the Settlement Agreement:

A.  Behavioral Rehabilitation Services (BRS) Agreement.

1.    Defendants will provide WISe services to class members receiving BRS who screen eligible for WISe and will expand WISe capacity, as needed.  WISe services delivered with BRS will be included in determining utilization and service intensity benchmarks stipulated by the parties on April 6, 2018.

2.    90 % of the children/youth will have been screened for WISe prior to placing a child out-of-state for facility-based services or placement in BRS. Reasons for placement in BRS when a child/youth screens eligible for WISe will be tracked in BHAS. This requirement will be fully achieved when the Defendants reach an average of 90% in three consecutive months prior to exit.

3.    90 % of the children/youth served in out-of-state services and BRS placements will have been screened for WISe as a part of discharge planning, if not already receiving WISe. This requirement will be fully achieved when the Defendants reach an average of 90% in three consecutive months prior to exit.

4.    The BRS policy will require (a) that shared planning meetings or FTDMs occur prior to determining whether placement in BRS is necessary and (b) that the regional BRS manager review the BRS referral packet for clear documentation of the reasons why BRS is necessary for youth who screen positive for WISe.

5.    In order to provide WISe services to class members who screen eligible for WISe and are receiving BRS, the State will take the following actions: (a)  After a review of four early implementation sites, DCYF and HCA will review the outcomes and lessons learned in order to expand the provision of WISe to youth also receiving BRS;  (b) DCYF will review and update Intensive Placement Resources and BRS policies to the extent needed to allow delivery of WISe services to class members receiving BRS; (c) By July 1, 2019, entities that currently provide both BRS and WISe services will have the option and be reimbursed to simultaneously provide both services to class members eligible for both BRS and WISe; (d) By August 2019, class members who are already enrolled in WISe services and who become eligible for BRS may remain in WISe services; (e) On or before October 1, 2019, DCYF will update and implement contracts with BRS providers to coordinate access to WISe for those class members who are receiving BRS and who screen eligible for WISe; (f) HCA will update the WISe manual and provide training to providers to address the expansion of WISe to class members receiving BRS and cross-system coordination; (g) Beginning October 1, 2019, all class members who screen eligible for WISe and are being referred for BRS will be offered WISe; (h) Beginning on October 1, 2019, class members who screen eligible for WISe and are already receiving  BRS will be eligible to receive WISe upon availability and until then

4

**TR MEDIATION DOCUMENT**
As of April 6, 2018 with June 26, 2019 Amendments

offered CFTs no less than every other month until WISe is provided.

B. **Extension of June 30, 2019 Estimate**

1. The parties agree to a 12-month extension (July 1, 2019 - June 30, 2020). The extension shall incorporate a new annual service target based on estimated June 30, 2020, caseload growth for Washington's age 0-20 Medicaid population.

2. At any time during the extension period, the State may seek to exit the agreement with three month's notice to class counsel. If the parties agree that the exit criteria have been met, the parties will submit a joint motion to dismiss to the Court. If class counsel does not agree that the exit criteria have been met, then the parties will seek to resolve issues through negotiation before seeking court relief by setting a meeting in accordance with Par 66 of the Settlement Agreement. If no agreement is reached during the meeting, the State will not seek to exit prior to June 30, 2020, unless the parties agree to an alternative exit date to the date provided in the extension in Par 1 above.

3. Defendants agree that they will continue to make good faith efforts to: a) negotiate the amount of attorneys' fees and costs pursuant to Paragraph 89 of the Settlement Agreement for Plaintiffs' attorneys' fees and costs for work up to and during the extension period; and b) secure a joint order for attorney fees and costs prior to final dismissal of the case.

4. During the 12-month extension (July 1, 2019 - June 30, 2020) Defendants shall track and report to Plaintiffs' counsel on a at least a quarterly basis WISe services denials, delays (including waiting times), or reductions in intensity, scope or duration, primarily due to insufficient service capacity. The parties will jointly determine the content, format and timing of these reports prior to the beginning of the extension period. In the event that Defendants already collect, track, and report the data points requested by Plaintiffs, Defendants can satisfy this requirement by producing current, existing reports containing the requested data points to the Plaintiffs every three months during the 12 month extension. The first submission from Defendants will occur on or before September 30, 2019.

On behalf of PLAINTIFFS' COUNSEL

_____
Leecia Welch
National Center for Youth Law
WSBA No. 26590

July 1, 2019
Date

**TR MEDIATION DOCUMENT**
As of April 6, 2018 with June 26, 2019 Amendments

**On Behalf of DEFENDANTS' COUNSEL**

Angela Coats McCarthy

Angela Coats-McCarthy
WSBA No. 35547
Eric Nelson
WSBA No. 27183
Assistant Attorneys General

July 1, 2019

Date

6